IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GWENDOLYN NESMITH | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 02-CV-2894 |
| INDEPENDENCE BLUE CROSS | : | |

**SURRICK, J.**                                                                                         FEBRUARY ___, 2004

### MEMORANDUM & ORDER

    Presently before the Court is the Motion of Defendant Independence Blue Cross for Judgment on the Pleadings (Doc. No. 19).  For the following reasons, Defendant's Motion will be denied.

**I.     Background**

    Plaintiff is an African-American female who began working for Defendant in 1990.  (Am. Compl. ¶¶ 6, 11.)  Her first position was as a telemarket assistant.  (*Id.* ¶ 12.)  Wandrella Mouton, a Caucasian, was Plaintiff's first supervisor.  (*Id.* ¶ 13.)  After approximately one and a half years as a telemarket assistant, Plaintiff became a sales support assistant, and was given an increase in salary.  (*Id.* ¶ 14.)  Marlene Gallone, who reported to Mouton, became Plaintiff's supervisor.  (*Id.* ¶ 15.)  Plaintiff remained a sales support assistant until approximately 1993-1994.  (*Id.* ¶ 16.)  While in this position, she complained to Defendant's human resources department that she was being subjected to race discrimination.  (*Id.* ¶ 17.)  Specifically, Plaintiff complained that Mouton had failed to promote Plaintiff to at least two different positions on account of her race, and had directed several racially offensive comments towards her.  (*Id.* ¶ 18.)

    Around the time of her complaint to human resources, Plaintiff suffered a miscarriage and left work temporarily on a medical leave of absence.  (*Id.* ¶¶ 19, 21.)  While on medical leave,

Defendant's human resources department told Plaintiff not to come back to work because Defendant planned to fire Plaintiff for complaining about Mouton. (*Id.* ¶ 19.) In response, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") charging Defendant with race discrimination. (*Id.* ¶ 20.) Plaintiff was on medical leave for approximately four to six weeks. (*Id.* ¶ 21.) After a conference with the EEOC, Plaintiff was permitted to return to work in a new position as a customer service representative. (*Id.* ¶ 21.) Plaintiff remained in this position for a year beginning in approximately 1994. (*Id.* ¶ 23.)

In 1995, Plaintiff applied to be an enrollment specialist with Defendant, and was subsequently hired for this position. (*Id.* ¶ 25.) As an enrollment specialist, Plaintiff's supervisor was Christine Bolden. (*Id.* ¶ 27.) Bolden learned of Plaintiff's prior complaint of discrimination from Plaintiff's co-worker, Caroline Kelly, an acquaintance of Mouton. (*Id.* ¶ 29.) Bolden mentioned Plaintiff's EEOC complaint five or six times. (*Id.* ¶ 28.) Kelly brought up Plaintiff's EEOC complaint regularly. (*Id.* ¶ 30.) For example, Kelly said to others in Plaintiff's presence that Plaintiff "has a pretty good lawyer," that no one thought Plaintiff was going to come back the first time, and that Plaintiff was the "girl who took charge out there." (*Id.*) Kelly made these and other similar comments at least five to six times per week the entire time Plaintiff was an enrollment specialist. (*Id.* ¶ 31.)

Chuck Ferro became Plaintiff's supervisor in approximately 1996 and remained so until Plaintiff was terminated. (*Id.* ¶ 32.) Ferro learned of Plaintiff's EEOC complaint from Kelly and brought it up at least twice per week. (*Id.* ¶ 33.) For example, after reviewing Plaintiff's work or responding to her questions, Ferro would say "let me take a good look at this or she may call the EEOC." (*Id.* ¶ 34.) Also, in front of other employees Ferro would say aloud when referring to

2

Plaintiff, "if I don't do this she'll call EEOC." (*Id.* ¶ 35.) When Plaintiff asked for a day off, Ferro responded, "let me check, if I don't grant it you'll call the EEOC on me." (*Id.* ¶ 36.)

Other employees were also antagonistic to Plaintiff about her EEOC complaint. Pat Henson, who worked in Defendant's human resources department, told Plaintiff that the department was watching Plaintiff because of the EEOC complaint and that nobody liked Plaintiff. (*Id.* ¶ 38.) Henson also said that the department would be watching everything Plaintiff did, including her time leaving, time calling, not calling, and on-time arrival, and that they would be listening to her phone call usage. (*Id.*) Peggy Shane, who also worked in Defendant's human resources department, mentioned Plaintiff's EEOC complaint. (*Id.* ¶ 39.) When Plaintiff went to see Shane regarding a personnel matter, Shane said "this is all your fault; we already know about your previous charge; nobody likes you." (*Id.* ¶ 40.) Another time, when Shane presented a disciplinary document for Plaintiff to sign, Shane said "just go ahead and sign it, we already know about you, we already know about your previous charge, just go ahead and sign the papers so you don't make things worse." (*Id.* ¶ 41.) Also, in 1995, when it was time for Plaintiff to get her five years of service award, a human resources manager said to Plaintiff, "I'm going to give you this, but you don't really deserve it because you took them [to] court." (*Id.* ¶ 43.)

Plaintiff's employment with Defendant terminated at the end of the summer in 1997. (*Id.* ¶ 44.) On July 17, 1997, Plaintiff slipped on the stairs at work as she was descending to the ground floor. (*Id.* ¶ 45.) Plaintiff was diagnosed with a sprained ankle and bruised knee. (*Id.* ¶ 46.) When her injuries failed to heal properly, Plaintiff was taken out of work indefinitely by her doctor beginning on August 7, 1997. (*Id.* ¶ 47.) Plaintiff mailed a doctor's note to Ferro

3

and called him several times in August to update him on her status.  (*Id.* ¶ 48.)

On August 29, 1997, at 5:50 p.m., the Friday before Labor Day, Plaintiff's mother received a Western Union telegram for Plaintiff at the mother's house.  (*Id.* ¶ 49.)  Plaintiff immediately went and retrieved the telegram, which was from Defendant and stated that if Plaintiff did not return to work that very day, Plaintiff would be terminated.  (*Id.* ¶¶ 50-51.)  Plaintiff called Defendant right away but no human resources personnel were available to speak with her.  Plaintiff left several voice mail messages.  (*Id.* ¶ 52.)  On Tuesday, September 3, 1997, the next business day, Plaintiff called Defendant's human resources department.  (*Id.* ¶ 53.)  Plaintiff spoke to Bill Blount who was aware of the situation.  Blount said that there had been a big misunderstanding and that there never had been any problem with any of the doctors' notes she had sent.  (*Id.* ¶ 54.)  Blount also said as soon as he got her doctor's note, he would reinstate her pay.  (*Id.* ¶ 55.)  Plaintiff immediately went to her doctor's office and faxed and mailed the doctor's note to Defendant.  (*Id.* ¶ 56.)  Over the next month, Plaintiff called and left messages for Blount, Ferro, Shane and Henson.  No one called her back.  (*Id.* ¶ 57.)  Plaintiff never received any formal notice of her termination.  (*Id.* ¶ 58.)  Finally, Plaintiff applied for unemployment benefits, which Defendant unsuccessfully contested.  (*Id.* ¶ 59.)

Based on the foregoing allegations, Plaintiff claims that Defendant retaliated against Plaintiff for opposing race discrimination.  Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. § 951, et seq. ("PHRA").

**II.    Standard of Review**

In reviewing a motion pursuant to Fed. R. Civ. P. 12(c), we apply the same standard used

to review a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Constitution Bank v. DiMarco*, 815 F. Supp. 154, 157 (E.D. Pa. 1993). We may not grant a judgment on the pleadings under Rule 12(c) "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Corestates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 193 (3d Cir. 1999) (quoting *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 54 (3d Cir. 1994)). We must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (quoting *Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir. 1980)). Of course, to survive a motion for judgment on the pleadings, "the plaintiff must set forth facts, and not mere conclusions, that state a claim as a matter of law." *Allstate Transp. Co., Inc. v. SEPTA*, C.A. No. 97-1482, 1998 WL 67550, *1 (E.D. Pa. Feb. 13, 1998).

**III.   Analysis**

To establish a prima facie case of retaliatory discharge under Title VII,[1] a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and (3) that a casual link exists between the protected activity and the employer's adverse action. *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir. 1994)). Defendant argues that Plaintiff has not pled sufficient facts to establish the third element of her prima facie case, namely, a casual link between her protected activity and termination. Plaintiff's protected activity was the filing of the

---

[1] The analysis required to assess Plaintiff's claim under the PHRA is identical to the analysis required for a Title VII claim. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir.1999). We therefore do not need to separately address her claim under the PHRA.

EEOC complaint in approximately 1992 or 1993.[2]  However, Plaintiff was not fired until August 29, 1997.  Four to five years separate Plaintiff's protected activity from Defendant's adverse action.  Defendant claims that because of this lengthy interval, Plaintiff cannot establish the required casual link as a matter of law.  We disagree.

The caselaw is clear that in a Title VII retaliation case, a plaintiff can show a casual link between her protected activity and the employer's adverse action in a number of ways.  One way is to show temporal proximity between the two events, from which an inference can be drawn that the employer's adverse action was in response to the plaintiff's protected activity.  However, "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar*, 109 F.3d at 178.  Indeed, the Court of Appeals for the Third Circuit has set forth "no limits" on the kinds of evidence that a court may consider when searching the record for the required casual link.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000); *see also Kachmar*, 109 F.3d at 177; *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997) ("When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."); *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) ("A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as

---

[2]Defendant claims Plaintiff filed her complaint with the EEOC in 1992 (Doc. No. 19 at 4), while Plaintiff claims she filed it in 1993 (Doc. No. 20 at 3).  It is not clear from the amended complaint what year the complaint was filed.  Whether it was filed in 1992 or 1993 is of no consequence in the resolution of this motion.

disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'") (emphasis omitted) (quoting *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)). Thus, for example, "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism [directed at the plaintiff] in the intervening period." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997). Evidence that the employer gave inconsistent reasons for the plaintiff's discharge can also be circumstantial evidence of causation. *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 289 (3d Cir. 2001). The element of causation is highly context specific, and requires looking at the record as a whole to determine whether the plaintiff has raised an "inference that her protected activity was likely the reason for the adverse action." *Kachmar*, 109 F.3d at 177-78 (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)).

Since the lack of temporal proximity is not fatal to Plaintiff's causation theory, we must assess whether Plaintiff has alleged sufficient facts to link her protected activity and discharge. We are satisfied that Plaintiff has met this burden. Plaintiff alleges that beginning in 1995, Defendant subjected her to a pattern of antagonism that included explicit references to the EEOC complaint. Plaintiff's supervisors and other co-workers brought up the EEOC complaint with Plaintiff on a regular basis. Hensen and Shane, who worked in the human resources department, told Plaintiff that nobody liked her because she filed the complaint. Hensen said that the department was watching everything that Plaintiff did.[3] In addition, there is evidence that

---

[3] While "[b]eing 'watched,' without more, is not proof of antagonism or retaliation," *Woods v. Bentsen*, 889 F. Supp. 179, 188 (E.D. Pa. 1995), Plaintiff has alleged additional evidence of a pattern of antagonism that began in 1995, including statements by her supervisors

Defendant invented a reason to fire Plaintiff. When Plaintiff was out on medical leave, Defendant sent her a telegram stating that Plaintiff would be fired if she did not return to work that very day. However, Defendant sent the telegram late in the afternoon and to Plaintiff's mother's house, suggesting that Defendant did not intend for Plaintiff to timely receive the ultimatum to return to work. Plaintiff was then falsely told that she would not be fired if she sent human resources her doctor's note. Viewing the record as a whole and in the light most favorable to Plaintiff, we conclude that Plaintiff alleged sufficient facts to raise an inference that her protected activity was likely the reason for her discharge.

      Defendant claims that even an intervening "pattern of antagonism" is not sufficient to show causation in this case because the pattern of antagonism allegedly did not begin until 1995, several years after Plaintiff's protected activity. In making this argument, Defendant relies heavily on *Steiner v. Sprint*, 957 F. Supp. 65 (S.D.N.Y. 1997), a case from the Southern District of New York. In *Steiner*, the court granted the defendants' motion for summary judgment on the grounds that the plaintiff had failed to make out a prima facie showing of a causal connection between her EEOC charge and eventual dismissal. The undisputed facts showed that the plaintiff filed her EEOC complaint in April, 1991, but did not experience any retaliation until September, 1993. The court said this passage of time was "far too long to permit a reasonable fact-finder to infer a causal connection between the two situations from the mere fact that they involved the same company, given the utter absence of any other proof of linkage." *Steiner*, 957 F. Supp. at 66 (citing *Johnson*, 931 F.2d at 207). Defendant reads *Steiner* to hold that a plaintiff cannot

---

and other co-workers that "nobody liked" Plaintiff and repeatedly referred to her EEOC complaint.

show causation when a lengthy interval separates the plaintiff's protected activity from the beginning of the pattern of antagonism. However, the *Steiner* court merely held that the plaintiff had not shown causation, given the lengthy interval *and* "the utter absence of any other proof of linkage." In this case Plaintiff's supervisors and other co-workers repeatedly told Plaintiff, among other things, that they did not like her and were watching her *because Plaintiff filed the EEOC complaint*. Thus, at this stage, the evidence linking Plaintiff's protected activity, the pattern of antagonism, and her discharge is sufficient.[4] Accordingly, we must deny Defendant's motion.

---

[4]Defendant also argues that mere knowledge of the protected activity does not, by itself, establish causation in a retaliation case, citing *Bazargani v. Haverford State Hosp.*, 90 F. Supp. 2d 643, 654 (E.D. Pa. 2000); *Sanders v. FMAS Corp.*, 180 F. Supp. 2d 698, 706 (D. Md. 2001). We agree. However, Plaintiff has alleged additional evidence linking her protected activity, the pattern of antagonism, and her discharge.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GWENDOLYN NESMITH | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 02-CV-2894 |
| INDEPENDENCE BLUE CROSS | : | |

**ORDER**

AND NOW, this ___ day of February, 2004, upon consideration of the Motion of Defendant Independence Blue Cross for Judgment on the Pleadings (Doc. No. 19), and all documents filed in support thereof and opposition thereto, it is ORDERED that Defendant's Motion is DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge